**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

**CARLA F. BATES,**

   **Plaintiff,**

**vs.**          **Civil No. 15-cv-678-DRH-CJP**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social**
**Security,**

   **Defendant.**

## MEMORANDUM and ORDER

**HERNDON, District Judge:**

 In accordance with 42 U.S.C. § 405(g), plaintiff Carla F. Bates seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

 Plaintiff applied for benefits in April 2012, alleging disability beginning on August 16, 2009.  (Tr. 20).  After holding an evidentiary hearing, ALJ Carla Suffi denied the application in a written decision dated February 25, 2014.  (Tr. 20-31). The Appeals Council denied review, and the decision of the ALJ became the final agency decision.  (Tr. 1).  Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1.    The ALJ erred in not giving appropriate weight to the opinions of her primary care physician, Dr. Svoboda,

2.    The ALJ did not properly evaluate plaintiff's credibility.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[1]   For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

---

[1] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.   20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009.

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step

three.   If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job**.**   *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).   *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made.   It is important to recognize that the scope of review is limited.   "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g).   Thus, this Court must determine not whether Ms. Bates was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made.   See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996), citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).   In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility,

or substitute its own judgment for that of the ALJ.  *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).   However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner.  See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Suffi followed the five-step analytical framework described above.   She determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date and that she was insured for DIB through June 30, 2017.   She found that plaintiff had severe impairments of obesity, lumbar degenerative disc disease, spinal stenosis, cervical degenerative disc disease status post fusion, post-laminectomy syndrome, and mild to moderate bilateral carpal tunnel syndrome.   She further determined that plaintiff's impairments do not meet or equal a listed impairment.

The ALJ found that Ms. Bates had the residual functional capacity (RFC) to perform work at the sedentary exertional level, with a number of physical limitations.  Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past relevant work.   She was, however, not disabled because she was able to do other jobs which exist in significant numbers in the local and national economies.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record

is directed to the points raised by plaintiff and is confined to the relevant time period.   Plaintiff has not raised an issue with respect to her mental impairments. Therefore, the Court will not summarize that evidence in any detail.

### 1.   Agency Forms

Plaintiff was born in 1967, and was 42 years old on the alleged onset date of August 16, 2009.   (Tr. 198).   She has a ninth grade education.   She had worked as a cook and a server/banquet worker in a restaurant.   (Tr. 202).

Plaintiff submitted a Function Report in June 2012, in which she stated that she was raising her six year old granddaughter.   She was also paid to do cleaning for her father under the "Help at Home" program.   She said she could not sit or stand for very long.   She prepared a meal every day and did some housework. She alleged problems in a number of areas, including sitting, standing, walking, reaching and using her hands.   (Tr. 218-225).

### 2.   Evidentiary Hearing

Ms. Bates was represented by an attorney at the evidentiary hearing on December 20, 2013.   (Tr. 47).[2]

Plaintiff testified that she was 5'3" tall and weighed 166 pounds.   Her weight went up and down.   She had custody of her seven year old granddaughter.   She and her granddaughter lived alone and plaintiff was her primary caretaker. Plaintiff did her granddaughter's laundry, cooked and cleaned, and took care of her granddaughter's long, curly hair.   She attended school meetings and programs.

---

[2] At the agency level, plaintiff signed a Fee Agreement with Binder & Binder.   At the hearing, she was represented by attorney Nirav Patel, an employee of Binder & Binder.   (Tr. 152).

Until the previous October, plaintiff was paid for nine hours of work a week for her father under the "Help at Home" program.   (Tr. 52-56).

Ms. Bates stopped working in August 2009 because she had neck pain and "severe catches" in her lower back.   (Tr. 63).   She had surgery on her neck in August 2011, and she "did real good" until the end of January.   She testified that she had problems with her hands.   Her hands were not asleep or numb, but "they wasn't right, and [she] would just lose whatever [she] had in [her] hand."   (Tr. 64). She had more problems with her right arm than her left because of her rotator cuff. (Tr. 66).

Plaintiff had some shots in her back, but she said that they "never did any good at all."   She wanted to hold off on having any back surgery because she knew people who had back surgery and the hardware broke.   Also, she had been told by one doctor that she did not need back surgery at this time.   That doctor referred her to pain management instead.   (Tr. 67).

Ms. Bates testified that she gets pain down her left leg if she is on her feet a lot.   If she sits for very long, she feels like she is sitting "on a ball of fire."   (Tr. 68). She cooked meals from scratch and was teaching her granddaughter to cook. She cleaned the house in "little steps."   She did not do any yardwork.   She no longer did any sewing, but she did sometimes do crafts with her granddaughter.   (Tr. 72-73).

A vocational expert (VE) also testified.   The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of

plaintiff's age and work history who was able to do work at the sedentary exertional level, limited to only occasional climbing of ramps and stairs, balancing, stooping, crouching, kneeling and crawling; no climbing of ladders, ropes or scaffolds; frequent reaching overhead with the left arm and occasional reaching overhead with the right arm; occasional use of the lower extremities for operation of foot controls; and frequent use of the bilateral upper extremities for handling and fingering.   The VE testified that this person could not do any of plaintiff's past work, but there were other jobs in the economy which she could do.   Examples of such jobs are credit checker, charge accounts clerk and lampshade assembler.   (Tr. 79-80).

The VE also testified that, if plaintiff were limited to only occasional handling and fingering, there would be no jobs that she could do.   (Tr. 81).   Further, if she were limited to only occasional reaching in all directions with both arms, all jobs would be eliminated.   (Tr. 82).

### 3.    Medical Treatment

The alleged date of onset is August 16, 2009.   The first medical record is an office note from the Hardin County General Hospital Clinic dated June 1, 2010. Ms. Bates was seen by Physician's Assistant DeNeal.   She complained of pain in her left hip and low back.   She was the primary caregiver for a four old child who lived with her.   On exam, she had tenderness over the left SI joint.   There was no tenderness of the cervical, thoracic or lumber spine and straight leg raising was negative.   (Tr. 496).   X-ray of the left hip was negative.   (Tr. 505).

In July 2010, an MRI of plaintiff's lumbar spine showed mild disc bulging at

L3-4 through L5-S1; moderate sized far left lateral disc protrusion at L5-S1 impinging on the exiting left L5 nerve root; mild circumferential spinal stenosis at L3-4 and L4-5; and tiny partial thickness annular tears at L4-5 and L5-S1 negative for focal disc herniation.   (Tr. 503-504).   She was referred to pain management for injections.   (Tr. 487).   However, in September 2010, plaintiff told PA DeNeal that she had decided not to have injections.   (Tr. 485).

Ms. Bates began treating at Goreville Family Practice in January 2011.   She complained of lumbar pain with occasional radiation into the left leg.   She had been referred to pain management but had "refused to go."   She was prescribed Ultram and Zanaflex.   (Tr. 447).

Plaintiff saw Dr. Sonjay Fonn, a neurosurgeon, in March 2011.   Plaintiff complained of neck and back pain, with her neck pain being worse.   She told Dr. Fonn that she had longstanding back pain which had gotten worse and caused her to quit work in 2009.   Dr. Fonn reviewed her lumbar MRI and recommended that she undergo a cervical MRI.   (Tr. 397-398).   In May 2011, Dr. Fonn noted that the cervical MRI showed minimal disc bulging at C4-5, 5-6 and 6-7 with a right sided lateral disc herniation at C5-6.   (Tr. 396).   Dr. Fonn administered three epidural steroid injections at C5-6, but the shots did not relieve her pain.   In July 2011, Dr. Fonn recommended surgery.   (Tr. 392-394).

Dr. Fonn performed cervical fusion surgery on August 5, 2011.   (Tr. 390). In November 2011, she was "doing very well with continued good resolution of pre-operative symptoms."   He prescribed physical therapy for post-op

rehabilitation.   (Tr. 388).   In January 2012, plaintiff told Dr. Fonn that she was having mild neck pain and numbness and tingling in her right hand.   Dr. Fonn noted that she had "met all surgical goals" and that she should return to him as needed.   (Tr. 387).

Plaintiff applied for social security disability benefits in April 2012.

Plaintiff began seeing primary care physician Dr. Craig Svoboda in July 2012.   She said she had been referred for pain management but she refused because she did not want to be "drugged up."   She then requested pain pills and told Dr. Svoboda that she took Vicodin or Norco and Valium after her surgery. She said she had three bottles of Valium at home and that she did not take them much, but then she said she took them up to three times a day.   She had been out of Norco since March 2012.   She also said she was trying to get disability and her only work was cleaning for her father.   On exam, he noted mild tenderness to the left upper buttock.   Dr. Svoboda told her to discontinue Valium and prescribed Norco.   (Tr. 601).

Ms. Bates returned to Dr. Fonn in July 2012, complaining of increased back pain radiating into her legs in the S1 distribution.   Physical exam was "essentially normal."   (Tr. 468).   The next month, Dr. Fonn noted that a repeat MRI showed varying degrees of neuroforaminal narrowing at several levels of the lumbosacral spine.   There was moderate to severe narrowing at L5-S1 on the left.   At L4-5, a disc bulge was in close proximity to the bilateral descending L5 nerves and might

abut the nerve on the right.   Physical exam was essentially normal.   Neurologic exam showed only 4/5 weakness bilaterally in the lower extremities.   (Tr. 467).

Dr. Fonn administered a series of epidural steroid injections at L4-5 and L5-S1.   He noted that the injections gave her "excellent relief" of her symptoms. (Tr. 466).   In November 2012, Dr. Fonn noted again that the injections gave her "excellent relief" and she wanted to proceed with another round.   (Tr. 629).

Dr. Svoboda refilled her Norco prescription in August, September, October and November 2013.   He also prescribed a muscle relaxer, Baclofen.   Plaintiff told Dr. Svoboda that the injections from Dr. Fonn "are no help."   (Tr. 597-600).   He again refilled her prescriptions in January 2013.   (Tr. 596).

On January 17, 2013, plaintiff was seen at Trinity Neuroscience Institute on a referral from Dr. Svoboda.   She was seen by Certified Physician's Assistant Angela Arnold.   Plaintiff complained of back pain with numbness in the left thigh and tinging in the right leg and into the foot.   She also complained of neck pain with radiation into the right arm and hand.   On exam, her gait was normal. Sensation was normal.   She had mild restriction of range of motion of the cervical spine.   Range of motion of the lumbar spine was normal.   She had pain over the right SI joint and left buttock.   Straight leg raising was negative.   Bilateral lower extremity strength was normal.   She had mild bilateral triceps weakness.   (Tr. 571-575).

On January 23, 2013, Dr. Fonn again noted "excellent relief" from the injections and that plaintiff wanted to hold off on any surgical intervention.   She was to return for another round of injections in four to six months.   (Tr. 636).

An EMG and nerve conduction study ordered by PA Arnold showed no evidence of cervical or lumbar radiculopathy, but there was mild to moderate bilateral carpal tunnel syndrome and mild bilateral ulnar neuropathy at the elbow. (Tr. 577-578).

Ms. Bates was seen by Dr. Mark Fleming at Trinity Neuroscience on January 31, 2013.   Plaintiff reported that the lumbar epidural steroid injections by Dr. Fonn "didn't help at all."   Dr. Fleming noted that plaintiff had mechanical low back pain with no radiculopathy, neck pain and atypical right arm symptoms.   Physical exam was normal.   Dr. Fleming advised plaintiff that she had "no surgically significant disease in the cervical or lumbar spine."   He noted that her symptoms were not consistent with carpal tunnel syndrome.   He recommended comprehensive pain management.   (Tr. 568-569).

In February 2013, plaintiff told Dr. Svoboda that the doctor at Trinity Neuroscience told her she did not need surgery.   She planned to do her pain management with Dr. Christie, a member of the Trinity group.   On exam, he noted mild to moderate tenderness in her low back.   He refilled her prescriptions but noted that her pain medications would be prescribed by the pain management specialist the next month.   (Tr. 594).

Ms. Bates returned to Dr. Svoboda the next month.   There is no mention of plaintiff's plan to see a pain management specialist, and Dr. Svoboda again refilled her Norco and Baclofen.   On exam, he noted tenderness and mildly reduced range of motion of the cervical spine and tenderness and moderate pain with motion of the lumbar spine.   (Tr. 590-593).

On April 17, 2013, plaintiff told Dr. Svoboda that Dr. Christie had injected her low back and this made her pain worse.   (There are no records of treatment from Dr. Christie in the transcript.)   She said she wanted to try Neurontin.   On exam, Dr. Svoboda again noted tenderness and reduced range of motion of the cervical spine and moderate pain with motion of the lumbar spine.   He refilled her prescriptions for Norco and Baclofen, and added Neurontin.   (Tr. 586-589).   In June 2013, Dr. Svoboda noted mild pain with motion in the cervical and lumbar spines.   (Tr. 640).

In August 2013, Ms. Bates told Dr. Svoboda that she had decided not to follow up with Dr. Christie and that she "refuses shots and/or surgery and just wants to take pain pills."   He wrote that she "got biligerent (sic) when [I] suggested she should listen to the advise [sic] of her specialists and not just take pain meds indefinitely but [she] says she will go to another pain clinic for eval[uation]."   (Tr. 641).   He described her overall appearance as "chronically ill-appearing."   On exam, he noted tenderness and mild pain in the cervical spine with motion and tenderness and moderate pain in the lumbar spine with motion.   He substituted

Flexeril for Baclofen, increased the dosage of Neurontin, and again prescribed Norco.  (Tr. 641-644).

Dr. Svoboda saw plaintiff seven more times.  He continued to refill her prescriptions for pain medication and muscle relaxers.  (Tr. 645-664, 666-677).  In September 2013, he described her appearance as "age appropriate" and noted tenderness and moderate pain with motion in the lumbar spine.  Her gait was "limp and full weight bearing."  (Tr. 647-648).  In October 2013, she had mild pain in the cervical spine and moderate pain in the lumbar spine.  Her gait was "compensated, full weight bearing and no assistive device."  (Tr. 652).  She returned about two weeks later requesting a note stating that she was unable to work; she wanted to give this letter to IDPA so she could get cash assistance.  (Tr. 654-654).  In November 2013, her gait was normal and she had moderate pain in the cervical spine and mild pain in the lumbar spine.  (Tr. 660).

On December 13, 2013, one week before the evidentiary hearing, plaintiff complained of right shoulder pain as well as back pain.  She also said she had swelling on and off in her hands which made her rings tight, but not much if any swelling in her feet.  On exam, her appearance was age appropriate.  Her gait was "compensated, full weight bearing and crutches."  She had tenderness and moderate pain in her lumbar spine and tenderness and moderately reduced range of motion in the right shoulder.  An x-ray of the shoulder showed no acute fracture or dislocation and no significant degenerative joint disease.  The impression was possible rotator cuff disease.  (Tr. 661-665).

On January 8, 2014, plaintiff's gait was "compensated, full weight bearing and no assistive device."   She had tenderness and mildly reduced range of motion of the cervical spine and tenderness and moderate pain with motion of the lumbar spine.   On January 24, 2014, the findings were the same except that the range of motion of her cervical spine was moderately reduced.   The notes refer to an MRI of the right shoulder, but the results of that study are not included in the transcript. (Tr. 674-677).

### 4.   Dr. Svoboda's Opinion

On January 24, 2014, Dr. Svoboda completed a form entitled "Spinal Impairment Questionnaire."   Dr. Svoboda diagnosed post-laminectomy syndrome of cervical laminectomy, neck pain, osteoarthritis, lumbago, lumbosacral spondylosis, lumbosacral spine degenerative disc disease, and generalized anxiety disorder.   He noted decreased range of right and left rotation of the neck and that she was able to bend down to about 85 degrees with the lumbar spine.   She had mild muscle spasm in the neck and no muscle spasm in the lumbar area, and no sensory loss, reflex change, muscle atrophy or muscle weakness.   Her gait was slightly stiff but stable and nonantalgic.   She had some tenderness to palpation of the posterior neck, lumbosacral spine midline and left paraspinal lumber muscles. Straight leg raising was negative bilaterally.

According to Dr. Svoboda, Ms. Bates can sit for a total of 3 to 4 hours a day and can stand/walk 1 hour at the most.   She must get up and walk around every 15 minutes.   She can frequently lift up to 5 pounds and can occasionally lift up to 20

pounds.   She would need to take frequent unscheduled breaks and would be likely to be absent from work more than 3 times a month.   (Tr. 678-684).

### 5.   Dr. Fonn's Opinion

In October 2012, Dr. Fonn completed a form entitled "Spinal Disorders." He indicated that a functional capacity evaluation would be required for him to assess her functional capacity.   He also noted that lumbar epidural steroid injections had given her "excellent relief of symptomatology."   (Tr. 463-465).

At the hearing, plaintiff's counsel stated that he did not think that a functional capacity evaluation had been done, but if it had, he would submit the report within 21 days of the hearing.   (Tr. 82).   Counsel later submitted additional records from Dr. Svoboda and that doctor's opinion, but not a functional capacity evaluation. See, Tr. 20.

<u>Analysis</u>

Because plaintiff's first point relies largely on her credibility, the Court turns first to her challenge to the ALJ's credibility determination.

The Court must use an "extremely deferential" standard in reviewing an ALJ's credibility finding.   *Bates v. Colvin*, 736 F.3d 1093, 1098 (7th Cir. 2013). The Court cannot reweigh the facts or reconsider the evidence, and can upset the ALJ's finding only if it is "patently wrong."   *Ibid*.   Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the

objective medical evidence and the claimant's testimony as a basis for a negative credibility finding."   *Schmidt v. Barnhart*, 395 F.3d 737, 746-747 (7th Cir. 2005), and cases cited therein.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, 1996 WL 374186, at *3.   While plaintiff's claims cannot be rejected solely because they are not supported by objective evidence, 20 C.F.R. §404.1529(c)(2), the ALJ may take that fact into consideration, since "discrepancies between objective evidence and self-reports may suggest symptom exaggeration."   *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008).

Here, ALJ Suffi gave three reasons for her adverse credibility finding.   She stated that plaintiff's activities are "simply inconsistent with allegations of disabling impairments."   She noted that plaintiff was noncompliant with her doctor's recommendation that she be treated by a pain management specialist.   And, she pointed out that Dr. Fonn's records said that injections significantly improved plaintiff's low back pain, but plaintiff told Dr. Fleming that the injections did not help at all.   See, Tr. 28.

Plaintiff's challenge to the credibility determination is not persuasive.   First, she ignores the obvious inconsistency about the improvement in her low back pain resulting from injections.   Secondly, she incorrectly characterizes the ALJ's point

regarding her noncompliance with treatment recommendations as being a criticism of her unwillingness to undergo further surgery.   See, Doc. 14, p. 21.   The ALJ did not disbelieve her because she refused further surgery.   In fact, as the ALJ recognized, Dr. Fleming advised plaintiff that he did not see a need for cervical or lumbar surgery.   (Tr. 27).   Rather, the ALJ was concerned that plaintiff has refused medical advice that she undergo treatment from a pain management specialist – a concern that Dr. Svoboda evidently shared.   Ms. Bates has not argued that she is unable to pursue such treatment because of lack of insurance or any other impediment.   Particularly in view of the fact that Dr. Fonn recorded that epidural steroid injections gave her excellent pain relief, the ALJ was entitled to infer from plaintiff's refusal to be treated by a pain management specialist that she was exaggerating her symptoms.

Plaintiff also argues that the ALJ ignored medical evidence by concluding that she had "no evidence of significant neck pathology" after her cervical spine surgery. Plaintiff cites to Tr. 26 in support of this statement.   According to plaintiff, the ALJ's conclusion is contradicted by the results of her January 2013 cervical MRI. See, Doc. 14, p. 19.   This argument is off the mark.   First, the ALJ did not state that plaintiff had "no evidence of significant neck pathology."   And, she did not ignore the January 2013 MRI.   Rather, she accurately stated that the MRI showed "minimal disc bulging with no compression."   (Tr. 26).   This is an accurate summation of the MRI results.   The radiology report, located at Tr. 606, describes "Degenerative changes as described above with minimal annular disk bulging . . .

without spinal stenosis or compression of neural structures."

Lastly, Ms. Bates argues that the ALJ improperly equated her "sporadic activities" with an ability to sustain full-time work.  It is true that the Seventh Circuit has cautioned ALJs about equating ability to engage in some daily activities with an ability to work full-time because daily activities allow for flexible scheduling and assistance from others, and do not require a minimum standard of performance.  See, *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014), and cases cited therein.   However, this does not mean that the ALJ should not consider a claimant's daily activities in assessing credibility.   On the contrary, 20 C.F.R. §404.1529 and SSR 96-7p direct the ALJ to consider, among other factors, a claimant's daily activities in assessing credibility.

Here, the ALJ did not improperly equate plaintiff's activities with an ability to work full-time.   Rather, she said that plaintiff's activities contradict her alleged limitations. For example, she reasonably concluded that the specific activities involved in caring for her seven year old granddaughter (caring for the child's long hair, doing crafts, cooking from scratch, cleaning) contradicted her claim that she was limited in her ability to use her hands.   She also reasonably concluded that Ms. Bates' activities in helping to care for her father as well as taking care of her granddaughter indicated that she was "rather active, uses her hands, and was on her feet."   (Tr. 28).

The Court notes that plaintiff told Dr. Svoboda in April 2013 that Dr. Christie, a pain management specialist, had injected her low back and this made

her pain worse.   There are no records of any treatment by Dr. Christie in the transcript.   Further, Ms. Bates testified that she had pain in her right shoulder from a rotator cuff problem, but no medical documentation of any such problem was submitted.   Ms. Bates was represented by counsel at the agency level.   "When an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making his strongest case for benefits."   *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987).   See also, *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007), noting that a claimant represented by counsel is presumed to have presented her best case for benefits.

In sum, plaintiff has not demonstrated that the ALJ's credibility analysis was "patently wrong" and therefore it will not be overturned.   *Bates*, 736 F.3d at 1098.

Plaintiff's other point regarding the weight given to Dr. Svoboda's opinion fares no better.

The ALJ is required to consider a number of factors in weighing a treating doctor's opinion.   The applicable regulation refers to a treating healthcare provider as a "treating source."   20 C.F.R. §404.1527(c)(2) states:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. <u>If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and</u>

<u>laboratory diagnostic techniques and is not inconsistent with the other</u> <u>substantial evidence in your case record, we will give it controlling</u> <u>weight.</u> [Emphasis added]

Obviously, the opinions of treating doctors are not necessarily entitled to controlling weight. Rather, a treating doctor's medical opinion is entitled to controlling weight only where it is supported by medical findings and is not inconsistent with other substantial evidence in the record. *Clifford v. Apfel*, 227 F.3d 863 (7th Cir. 2000); *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001).

If is the function of the ALJ to weigh the medical evidence, applying the factors set forth in §404.1527. Supportability and consistency are two important factors to be considered in weighing medical opinions. In a nutshell, "[t]he regulations state that an ALJ must give a treating physician's opinion controlling weight if two conditions are met: (1) the opinion is supported by 'medically acceptable clinical and laboratory diagnostic techniques[,]' and (2) it is 'not inconsistent' with substantial evidence in the record." *Schaaf v. Astrue,* 602 F.3d 869, 875 (7th Cir. 2010), citing §404.1527.

The ALJ must be mindful that the treating doctor has the advantage of having spent more time with the plaintiff but, at the same time, he may "bend over backwards" to help a patient obtain benefits. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). See also, *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985) ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

When considered against this backdrop, the Court finds no error in the ALJ's

weighing of Dr. Svoboda's opinion.   She correctly noted that the questionnaire submitted by the doctor in January 2014 listed "extreme limitations."   She assigned this opinion little weight because it was not supported by objective medical evidence.   She pointed out that the doctor's office note for the January 2014 visit showed some tenderness and limitation of motion, but these limitations were not quantified.   She also noted that Dr. Svoboda had not indicated any neurological deficits in his report, and that he imposed "extreme standing/walking limits of less than an hour for the entire workday, yet she was able to fully bear weight without assistance."   (Tr. 29).   In addition, in her review of the medical evidence, ALJ Suffi noted that Dr. Svoboda's exams showed "minimal deficit."   He recorded that plaintiff had normal sensation in her hands, fingers and forearms, and normal strength in the upper extremities.   (Tr. 27-28).

The ALJ's review of the medical evidence demonstrates that Dr. Svoboda's opinion was not supported by his own treatment notes, and it was contradicted by the other medical evidence in the file.   For instance, she pointed out that Dr. Fonn's records indicate that plaintiff had excellent relief of her symptoms with lumbar epidural steroid injections, and both Drs. Fonn and Fleming noted normal physical exams with normal range of motion, normal sensation, normal strength and negative straight leg raising.   (Tr. 26-27).

An ALJ can properly give less weight to a treating doctor's medical opinion if it is inconsistent with the opinion of another physician, internally inconsistent, or inconsistent with other evidence in the record.   *Henke v. Astrue*, 498 Fed.Appx.

636, 639 (7th Cir. 2012); *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

Further, in light of the deferential standard of judicial review, the ALJ is required

only to "minimally articulate" her reasons for accepting or rejecting evidence, a

standard which the Seventh Circuit has characterized as "lax." *Berger v. Astrue*,

516 F.3d 539, 545 (7th Cir. 2008); *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir.

2008).   The Court finds that ALJ Suffi more than met the minimal articulation

standard here.

Plaintiff also suggests, in passing, that the ALJ failed to identify any medical

opinions or other persuasive evidence to support her RFC findings.   See, Doc. 14,

p. 19.   On the contrary, her conclusion that Ms. Bates is capable of performing a

range of sedentary work is supported by the evidence she identified, i.e., the

medical records and plaintiff's own activities.   Plaintiff's suggestion that the ALJ

must rely on a medical opinion for her RFC assessment is incorrect.   "As we have

stated previously, an ALJ must consider the entire record, but the ALJ is not

required to rely entirely on a particular physician's opinion or choose between the

opinions [of] any of the claimant's physicians."   *Schmidt*, 496 F.3d at 845.

Even if reasonable minds could differ as to whether Ms. Bates was disabled

at the relevant time, the ALJ's decision must be affirmed if it is supported by

substantial evidence, and the Court cannot make its own credibility determination

or substitute its judgment for that of the ALJ in reviewing for substantial evidence.

*Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012); *Elder v. Astrue*, 529 F.3d

408, 413 (7th Cir. 2008).   ALJ Suffi's decision is supported by substantial

evidence, and so must be affirmed.

### Conclusion

After careful review of the record as a whole, the Court is convinced that ALJ Suffi committed no errors of law, and that her findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Carla F. Bates' application for disability benefits is **AFFIRMED**.

The clerk of court shall enter judgment in favor of defendant.

**IT IS SO ORDERED.**

Signed this 10th day of May, 2016.

Digitally signed by
Judge David R.
Herndon
Date: 2016.05.10
16:48:37 -05'00'

**United States District Judge**